Osier v. The City of Burlington, No. S1588-09 CnC (Crawford, J., Sept. 25, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Chittenden Unit | DOCKET NO.: S1588-09 CnC |

FRED OSIER and EUGENE SHAVER
    Plaintiffs

v.


THE CITY OF BURLINGTON and
JONATHAN LEOPOLD
    Defendants

## DECISION ON THE CITY'S MOTION TO DISMISS AND ON PENDING MOTIONS FOR SUMMARY JUDGMENT

This is a taxpayer lawsuit brought by two residents of the City of Burlington (the City). It alleges the misuse of general City funds to cover capital expenses and operating losses incurred by Burlington Telecom (BT)—a City-owned cable system. Alleging a need to recover taxpayer funds paid in violation of law, fraud and deceit, and breach of the duty of faithful performance, the plaintiffs seek to hold Jonathan Leopold, Chief Administrative Officer of the City during the period when the deficit was incurred, personally liable for approximately $17 million dollars paid out of the City's "pooled cash account" to cover BT's expenses during the years 2007 to 2010.

Plaintiffs also name the City as a defendant. Although they previously alleged conversion, plaintiffs now sue the City for "Recovery of Taxpayer Funds Paid to BT in Violation of Law." As against the City, plaintiffs seek an order requiring BT to reimburse the pooled cash account for the $17 million it has borrowed from this account in violation of the Certificate of Public Good (CPG) issued by the Public Service Board. They also seek an accounting and an order permanently enjoining the City from taking any further actions that violate BT's CPG or the City Charter, or that are likely to place Burlington taxpayers at further risk of financial loss.

Numerous motions are currently pending: (1) Plaintiffs' motion for summary judgment against Mr. Leopold (filed Aug. 1, 2011); (2) the City's motion for summary judgment (filed Oct. 24, 2011); (3) Mr. Leopold's motion for summary judgment (filed Feb. 17, 2012); (4) the City's Rule 12(b)(1) motion to dismiss (filed Apr. 2, 2012); (5) Mr. Leopold's motion to dismiss Counts I and III (filed April 3, 2012); and (6) Mr. Leopold's (renewed) motion for summary judgment on Count II (also filed April 3, 2012). On May 8, 2012, Mr. Leopold filed a motion to amend his answer and affirmative defenses to add 24 V.S.A. § 903 as an affirmative defense. The court held a hearing on all pending motions on June 27, 2012, granted Mr. Leopold's motion

to amend on August 3, 2012, and is now in receipt of the parties' briefing on the question of 24 V.S.A. § 903 as well as all of the other issues raised in the earlier motions.

FACTS

The essential facts concerning the BT controversy are not in dispute. They have been the subject of several previous inquiries, most notably the order of the Public Service Board (PSB) which issued on 10/8/10, available at http://psb.vermont.gov/sites/psb/files/orders/2010/7044 OrderReSummaryJudgment.pdf.

The Burlington City Charter has long authorized the City to operate its own municipal electrical system. In 1996, the Vermont legislature amended the charter to permit City "ownership, operation and utilization of cable television, fiber optic cable and other telecommunications within the corporate limits of the city." 1995, No. M-17 (Adj. Sess.), § 23 (codified as amended at 24 V.S.A. app. ch. 3 § 431(4) (City of Burlington)). The charter change required such a City-owned utility to obtain a certificate of public good (CPG) from the Public Service Board.

The charter amendments also addressed the issue of funding for BT. Section 438(c) of the City Charter provides in part:

> If the city [elects to build a cable system], the public service board, in considering any application for a certificate of public good, shall ensure that any and all losses from these businesses, and, in the event these businesses are abandoned or curtailed, any and all costs associated with investment in cable television, fiber optic, and telecommunications network and telecommunications business-related facilities, are borne by the investors in such business, and in no event are borne by the city's taxpayers, the state of Vermont, or are recovered in rates from electric ratepayers.

24 V.S.A. app. ch. 3 § 438(c). From its conception, BT was required to pay its own way. The legislature prohibited the use of taxpayers' money to pay for capital or operating costs.

The Public Service Board issued a CPG in September 2005. The certificate includes Condition 60 which follows the charter amendment in forbidding the use of public money to pay for the cost of the BT "build-out" or construction. Condition 60 states:

> The City shall make payments on behalf of [the build-out of BT] only when and to the extent that BT has cash reserves, revenues receivable, or other payments receivable that, collectively, equal or exceed the sum of the payments to be made by the City plus the balance of any other current payments owed to the City. BT

2

may participate in the City's pooled cash management system provided, however, that BT shall reimburse the City within two months of the City's expenditure for any expenses incurred or payments made by the City in support of services that BT provides to non-City entities. The City shall obtain Board approval prior to appropriating any funds other than as described above in the support of BT's [build-out] activities.

Certificate of Public Good dated 9/13/05. Since 2007, BT has been unable to meet its construction costs and other expenses from operating revenues. Commencing in January 2007, it withdrew more money from the City's pooled cash account than it paid in. (The pooled cash account is the equivalent of a common checking account maintained for the use of all City departments.) By March 2007, it was in violation of Condition 60 because it had run a deficit in the account for more than 60 days.

According to defendants, BT was able to repay its initial overdraft in August 2007 when it obtained financing from CitiCapital. The relief was short-lived. By November 2007, BT was, again, drawing more money out of the pooled cash account than it put in. By January 2008, it was in violation of Condition 60 because the deficit had lasted more than 60 days. The deficit position continues to the present day and is currently approximately $16.9 million.

Jonathan Leopold was the Chief Administrative Officer of the City from April 2006 until July 1, 2011. As CAO, Mr. Leopold had direct supervisory authority over the finances of BT and the use of the pooled cash account. In his deposition, Mr. Leopold states that he was unaware of Condition 60 and the restriction on the use of the account until an attorney for the City informed him about the condition in November 2008. Mr. Leopold describes his decision to allow BT to run a large deficit in violation of the original charter amendments and the Certificate of Public Good as a pragmatic decision to borrow money in the short-term until refinancing was in place. He states that refinancing became unavailable in 2008 when the credit markets in the United States and elsewhere entered a state of crisis.

There is no evidence that any funds withdrawn from the pooled cash account were used for any purpose except the construction costs and other normal business expenses of BT. City money drawn from many departments—and from the taxpayers—was used to meet BT's expenses. There is no evidence—indeed, no allegation whatsoever—of corruption or personal benefit to Mr. Leopold or any other City employee. The plaintiffs allege only that the use of these City funds was unauthorized and occurred in obvious violation of the city charter and the requirements of the Public Service Board.

Additional facts and procedural history material to the issues presented are set forth as necessary below.

3

ANALYSIS

As noted above, there are numerous motions pending that raise a variety of different issues.  The court finds it helpful to divide its analysis into parts addressing separately plaintiffs' claims against the City of Burlington and plaintiffs' claims against Jonathan Leopold.

I.  Claims Against Mr. Leopold

The three claims against Mr. Leopold are: (1) "Recovery of Taxpayer Funds Paid to BT in Violation of Law"; (2) fraud and deceit; and (3) breach of the duty of faithful performance. Under each of these theories, plaintiffs seek a judgment requiring Mr. Leopold to repay the $17 million.  See Fourth Am. Compl. ¶ 1 ("Plaintiffs seek a judgment requiring Defendants to repay such funds promptly and with interest . . . ."); ¶ 37 ("Plaintiffs seek equitable relief requiring Defendants to restore to the City's General Fund all sums advanced to BT from the cash pool in violation of BT's CPG or City Charter, plus interest.").[1]  Each of these three claims is the subject of the plaintiffs' August 2011 summary judgment motion, Mr. Leopold's February 2012 summary judgment motion, or Mr. Leopold's April 2012 motions to dismiss and for summary judgment.  Much of the briefing has focused on whether Mr. Leopold is entitled to qualified immunity.[2]

This is not the first time American taxpayers have sued to impose personal liability on public officials for spending public funds without authorization.  Various states have developed tests for when an official is personally responsible for the expenditure.  This case is one of the first in which taxpayers seek to recover against a Vermont official.  In determining the principles which apply in this state, the court turns first to the spectrum of experience in other states.

Some courts have ruled that public officials who spend money without legal authorization are personally liable for those amounts regardless of motive or other considerations.  See *Stanson v. Mott*, 551 P.2d 1, 15 n.12 (Cal. 1976) (collecting cases following the "strict liability" rule); 63C Am. Jur. 2d *Public Officers and Employees* § 339 ("Some courts . . . have followed a strict liability rule and hold a public official personally liable whenever he or she has permitted expenditures that the public entity is not authorized to make.").  This is the rule which plaintiffs seek to apply in their August 2011 motion for summary judgment and in their subsequent filings. Plaintiffs assert that the only facts material to their motion are that the Public Service Board adopted Condition 60, that Mr. Leopold was responsible for all expenditures from the City's "cash pool," and that Mr. Leopold authorized the expenditure over time of more than $16.9

---

[1] Paragraphs 1 and 37 are incorporated into each Count of the Fourth Amended Complaint.  See *id*. ¶¶ 38, 48.

[2] The topic of qualified immunity has also been discussed in some of the court's prior rulings in this case.  E.g., Ruling on Def. Leopold's Mot. to Dismiss at 5 (filed Aug. 19, 2010); Ruling on Mot. for Interlocutory Appeal at 5 (Oct. 20, 2010).

million for BT from the "cash pool" in violation of Condition 60.  See Pls.' Reply at 2 (filed Oct. 11, 2011).

The majority of states have not adopted a rule of strict personal liability for unauthorized expenditures.  Instead, they have imposed requirements of unreasonable behavior or bad faith which limit recovery against a public official for misspent money.

Some states require a showing of negligence.  In *Stanson*, the California Supreme Court adopted a "due care" standard under which public officials could be personally liable "if they spend funds having reasonable cause to suspect that the expenditure might be improper, or if they fail to prevent an improper expenditure because of negligent performance of their official oversight duties."  551 P.2d at 15 n.12.

More frequently other states have adopted a "good faith" standard.  See *State v. Newbern*, 398 N.E.2d 683, 686 (Ind. Ct. App. 1979) ("[W]e hold that when a controller acts in good faith, reasonably believing that he has the authority to approve expenditure of the money for the stated purpose, he will not be held individually liable for the money if the expenditure is later determined to be inappropriate.").  Connecticut requires both a showing of subjective good faith and an additional showing that there was ambiguity about the extent of the official's authority.  See *Arminio v. Butler*, 440 A.2d 757, 762–63 (Conn. 1981) (general rule is to hold public officials personally liable for unauthorized expenditures, even if in good faith, but recognizing an exception in cases where the illegal payment "is for a public purpose, the municipality has received fair value for the money expended, the official did not receive personal profit, and the source of the authority violated by the office is clearly ambiguous").

Still other states have enacted legislation to limit personal liability to willful violations of spending limits.  See *Powers v. Goodwin*, 291 S.E. 2d 446, 470 (W.Va. 1982) (noting personal liability provisions in W. Va. Code § 11-8-29); *Burt v. Blumenauer*, 699 P.2d 168, 177 (Or. 1985) (discussing Oregon's personal liability statute, ORS § 294.100).

The Vermont courts have not addressed the appropriate standard.   The Vermont legislature, however, has enacted a single provision which greatly limits the potential liability of a municipal official for expenditures of public funds.  Title 24, section 903—entitled "Nonliability of municipal officers for money paid out"—provides:

> An action shall not be maintained against a person for money paid out by him as an officer of a municipal corporation in accordance with a vote of such corporation, whether such vote was valid or not.

Although this provision has been part of the law of Vermont in substantially the same form since its enactment in 1896, it has apparently not been cited in any reported case.  Within the confines of the statute, it provides immunity from claims for repayment of expenditures by municipal officers.

5

Are the required elements of § 903 present in this case?   The court concludes that they are.

1.  There is no dispute that this is an action for money paid out by Mr. Leopold as an officer of a municipal corporation.  There is no dispute that he authorized the expenditures from the "pooled cash" account and that he did so in his capacity as Chief Administrative Officer of the City of Burlington.

2.  The money was paid "in accordance with a vote of such corporation."  The record is now clear that each of the City's annual budget resolutions called for the expenditure of substantial funds for BT.   Each resolution was adopted following a vote by the City Council.  To understand what was voted on requires a close reading of the budget resolutions.

In each of the years in question, the City Council adopted a budget for BT which included budgeted revenues as well as budgeted expenditures.  The budgeted revenues and expenditures for the years in question were:

| Fiscal Year | Budgeted REVENUES including revenue from BT operations as well as financing | Budgeted EXPENDITURES all subject, however, to the "available for expenditure" limitation described below |
|---|---|---|
| 2007 | $8,091,510.00 | $ 8,458,890.00 |
| 2008 | $9,673,644.00 | $ 9,673,644.00 |
| 2009 | $6,051,010.00 | $17,163,536.00 |
| 2010 | $8,832,166.00 | $15,874,130.00 |

The *actual* revenues and expenditures for each year in question turned out to be less than the budgeted figures.  The difference between actual revenues and actual expenditures is deficit spending.  It is hardly surprising that BT had to build its cable network before it could receive income from subscribers or that in the early years of construction costs were much greater than revenues.

There are only two ways that an organization can operate at a deficit.  It can borrow the money from elsewhere.  BT did this twice but was unable to refinance after 2008.  The other way is that it can spend money from reserves or accounts which were intended for other purposes.  This was what Mr. Leopold authorized in violation of Condition 60.

But for purposes of § 903, did he authorize this spending in violation of the budget resolutions passed by City Council?  The answer has to be "No."  Each annual expenditure was the subject of a budget vote.  The resolutions expressly authorized expenditures in 2009 and 2010 that were approximately $11 million and $7 million dollars in excess of budgeted revenues.  This budgeted shortfall is roughly equal to the deficit from "pooled cash."  In approving expenditures in excess of budgeted revenues, the City Council recognized that in some years, the cost of building out BT would exceed any reasonable estimate of revenues.  The budget

6

resolutions make it clear that City Council authorized deficit spending in excess of income during the years at issue.

Before reaching the conclusion that the expenditures were authorized, the court considers two issues.

A.  <u>What is the meaning of the "limitation on expenditures" provision?</u>

The budget resolutions all contain language which reduces spending if there is a shortfall in revenues:

> [T]he appropriations for . . . all Enterprise Funds[3] . . . shall not be considered appropriations which are available for expenditure unless and to the extent that there is received for the benefit of such accounts the level of estimated revenue for the credit of such accounts equivalent to the amount set forth in the budget.

In other words, a shortfall in revenues must reduce the actual spending dollar-for-dollar.  In fact, BT did reduce its spending in fiscal year 2007.   Moreover, applying the limitation on expenditures this way, there is no suggestion in the record that, in any of the years in question, BT spent more than the appropriations "available for expenditure."[4]

Plaintiffs place far greater weight on this provision.  They contend that no spending was authorized in excess of operational revenues.  If this were true, then all spending in excess of revenues would be unauthorized. Neither the language nor the context of the provision supports such an interpretation.  The provision reduces appropriations by any difference between revenues *received* and revenues *budgeted*.  If the operational revenue projection was too rosy, then spending in that year must be reduced.  But the comparison is only between budgeted and actual revenues – not between total appropriations, including deficit spending to be covered by financing, and actual revenues.

Read as a whole, the budget resolutions support this interpretation.   As previously discussed, the resolutions anticipate a great deficit between revenues and spending, including construction costs, in the years in question (2007 – 2010).  It makes sense to adjust spending downwards in response to a relatively small shortfall in actual revenues.  It makes no sense to pretend that BT revenues would be sufficient to pay for construction in the early years of the enterprise.

---

[3] There is no dispute that BT is an "Enterprise Fund."

[4] The only possible exception is fiscal year 2008, but Mr. Leopold points out—and plaintiffs do not dispute—that the FY 2007 budget resolution included a carryover clause that carried over unexpended balances from the 2007 appropriations to fiscal year 2008, and the application of that carryover clause meant that BT's expenditures in 2008 were within the authorized budget.

For purposes of this case, the "limitation on expenditures" provision does not change the conclusion that the expenditures, adjusted downwards in some years, were authorized by vote of the council.

B. Does the existence of Condition 60 change the effect of § 903?

The funds in dispute were clearly paid out in violation of the requirements of the state regulator. In applying § 903 to this lawsuit, the court does not condone this behavior. The use of the pooled cash account fell far below standards of candor and rectitude which we expect from public officials. It also violated the promise made to the citizens at the time of the Charter amendments in 1996 that BT would not be built with taxpayers' money.

These observations do not change the immunity provision. Even an unlawful vote – held in secret or without notice to the public, for example – would be sufficient to confer immunity on municipal officials. Section 903 does not mince words. An official is immune from suit when he spends money authorized by vote, legal or not. Mr. Leopold may have violated the regulatory condition, but he did not spend money without authorization from the City Council.

The court concludes that the immunity created by § 903 applies in this case. There is no need to go further to determine whether Vermont will adopt a "good faith" standard for an expenditure falling outside of § 903. The court grants Mr. Leopold's motion for summary judgment on the narrow ground that the annual expenditures for BT were all authorized by vote of the City Council.

## II. Plaintiffs' Claim Against the City

The only count in the Fourth Amended Complaint that is directed against the City is Count I: "Recovery of Taxpayer Funds Paid to BT in Violation of Law." As mentioned above, plaintiffs seek an order requiring BT to reimburse the pooled cash account for the $17 million it has borrowed from this account in violation of the CPG issued by the PSB. They also seek an accounting and an order permanently enjoining the City from taking any further actions that violate BT's CPG or the City Charter, or that are likely to place Burlington taxpayers at further risk.

The City now moves to dismiss Count I on the following grounds: (1) the court should apply the doctrine of primary jurisdiction and decline to exercise jurisdiction in favor of the Public Service Board, and (2) plaintiffs' recovery claim against the City is not ripe. In a motion for summary judgment filed on October 24, 2011, the City also argues that plaintiffs do not have standing to pursue their claims against the City because the relief they seek would materially interfere with the City's ability to operate BT, and that the claims against the City should be dismissed under V.R.C.P. 17 because the "real parties in interest" who are pursuing this case

8

have refused to identify themselves or be named as plaintiffs in this action.[5] The court considers together all of the City's arguments, whether raised in the motion to dismiss or the motion for summary judgment.

A. Standing / Real Party in Interest

The City acknowledges that, as a general proposition, taxpayers have standing to seek relief from official action. The City argues, however, that plaintiffs lack standing in this case because the relief they seek concerns a proprietary function of the City. In support, the City cites McQuillin for the proposition that "[d]iscretionary powers relating to the management of a public utility by a municipality will not be interfered with by injunction at the instance of taxpayers . . . ." 18 E. McQuillin, The Law of Municipal Corporations § 52.21 (3d ed.) (WL updated Oct. 2011). Plaintiffs maintain that the City cannot defeat their suit against it on the grounds of discretionary decision-making because to do so would be contrary to legislative intent and would permit the City to get away with spending public funds secretly and illegally.

The rule set forth in McQuillin is, however, subject to an exception. Examination of the cases cited shows that courts will not interfere just because they might disagree with a business judgment, but will entertain suit in cases involving, among other things, violation of law. E.g., *Butler v. Karb*, 117 N.E. 953, 955 (Ohio 1917) (quoting *Dailey v. New Haven*, 22 A. 945, 947 (Conn. 1891)). Violation of law is precisely what plaintiffs allege in this case.

The City also argues that Osier and Shaver are not the real parties in interest because other individuals are paying their litigation fees and costs. "The Vermont Rules of Civil Procedure require that every action be prosecuted in the name of the real party in interest." *Smedberg v. Detlef's Custodial Serv., Inc.*, 2007 VT 99, ¶ 30, 182 Vt. 349 (citing V.R.C.P. 17(a)). The effect of this rule "is that the action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." *Id.* (quoting 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1543, at 334 (2d ed. 1990)). This inquiry has to do with the named-plaintiffs' entitlement to enforce their rights, not with who is paying for the litigation. See *Krohn v. Gardner*, 433 N.W.2d 95, 98 (Neb. 1995) (agreement between insureds and their insurer under which insurer agreed to supply counsel and pay costs related to insureds' attempt to secure judgment against tortfeasor did not assign any right of action, nor did it change the fact that the insureds were the real parties in interest); *Speer v. Cimosz*, 642 P.2d 205, 208 (N.M. Ct. App. 1982) (chiropractor was counsel's client and the real party in interest

---

[5] The City's summary-judgment motion was filed prior to the Fourth Amended Complaint, and addressed some issues that are no longer germane, such as conversion (which is not asserted in the Fourth Amended Complaint) and BT's capacity to be sued (which is irrelevant now because the Fourth Amended Complaint does not name BT as a defendant). However, the summary-judgment motion also discusses the primary jurisdiction question, argues that plaintiffs' claims for an accounting and a permanent injunction are moot, and asserts the standing and real-party-in-interest arguments.

despite the fact that chiropractor's legal fees in action to recover for services rendered were paid by chiropractic legal fund).

For these reasons, the court concludes that neither the standing doctrine nor the real-party-in-interest requirement presents a hurdle to plaintiffs' claim against the City. The court will therefore deny the City's October 24, 2011 motion for summary judgment.

B. Primary Jurisdiction and Ripeness

The court previously took up the issue of primary jurisdiction in its "Ruling on Motion to Dismiss" dated May 11, 2010. The court considered the three factors set forth in *Gallipo v. City of Rutland*, 2005 VT 83, 178 Vt. 244, and concluded that each factor favored deferring to the PSB. Ruling at 3–5 (Toor, J.). The court also considered the danger of inconsistent rulings, and concluded that that factor also weighed in favor of deferring to the PSB. *Id.* at 5. However, the court reasoned that plaintiffs' right to be heard in the PSB proceedings was significant, and concluded that, rather than dismissal, it would be more appropriate to order a stay to permit plaintiffs to seek participation in the PSB process.

On July 19, 2010 plaintiffs Osier and Shaver moved to intervene in the PSB's Docket No. 7044. The PSB denied the motion. See Order Re Motion to Intervene, No. 7044 (Vt. Pub. Serv. Bd. Dec. 16, 2010), available at http://psb.vermont.gov/sites/psb/files/orders/2010/7044 OrderReTaxpayerIntervention.pdf. Plaintiffs subsequently moved to lift the stay in this court, and the court granted the motion. See Ruling on Motions at 1–2 (filed Jan. 21, 2011) (Toor, J.) ("[The] stay was imposed to allow the Public Service Board to address the issues first. Plaintiffs have submitted a decision from the PSB denying their motion to intervene. No party has opposed the motion. The motion is granted."). In a ruling dated March 3, 2011, the court acknowledged that the City and BT in fact did file an opposition to the motion to lift the stay, but determined that the opposition did not alter its conclusion:

> As the City and BT point out, many of the rationales for the court's original stay order still apply as long as the related matter is pending before the Public Service Board. However, the PSB has now rejected the Plaintiffs' attempt (albeit a half-hearted one) to intervene in that action. Moreover, this case is proceeding against defendant Leopold in any event. Because Plaintiffs have no other legal forum in which to be heard, and because it would be inefficient to have discovery proceed only against Leopold when the issues as to all the defendants are overlapping, the court concludes that there is no reason to continue the stay in this case. If, in the future, particular actions are requested from the court that would directly raise the specter of potentially inconsistent rulings, the parties may raise the issue at that time.

Ruling on Mot. To Recons. at 1–2 (filed Mar. 3, 2011) (Toor, J.). Docket No. 7044 remains open with the PSB.

In its Rule 12(b)(1) motion, the City now asserts that its violation of Condition 60 is the subject of PSB Docket No. 7044, that the issue of the remedy for that violation will be addressed by the PSB, and that whether or not plaintiffs may intervene in the PSB proceeding should not be a determinative factor in deciding whether to dismiss this case on primary jurisdiction grounds. Along similar lines, the City contends that plaintiffs' Count I is not ripe for review because the PSB is addressing the same issues raised in that claim, and because the City's cure period is ongoing.

Plaintiffs argue that (1) the City's motion to dismiss is too late pursuant to V.R.C.P. 12(b) and is barred by the law-of-the-case doctrine and (2) the court's earlier ruling denying the City's motion to dismiss was correct. In reply, the City asserts that plaintiffs have not articulated a valid reason to apply the discretionary law-of-the-case doctrine, especially in light of the different posture of this case now compared to March 2011.

It is true that a Rule 12(b) motion must generally be made "before pleading if a further pleading is permitted." V.R.C.P. 12(b). "A strict interpretation of the timing provision's language leads to the conclusion that the district judge must deny any Rule 12(b) motion made after a responsive pleading is interposed as being too late." 5C Wright, Miller, Kane & Marcus, Federal Practice and Procedure: Civil 3d § 1361 (WL updated Apr. 2012). There are exceptions, however, including the certain defenses preserved pursuant to V.R.C.P. 12(h). See *id.*

Here, the City's Rule 12(b)(1) motion to dismiss the count against it in the fourth amended complaint was filed on April 2, 2012. This was after the City answered the third amended complaint (February 14, 2011). The court gave defendants until April 1, 2012 to answer the fourth amended complaint; the City did not file an answer but instead filed its Rule 12(b)(1) motion on April 2, 2012. There is some dispute about whether the City's motion is truly a challenge the court's jurisdiction (and thus whether it comes within V.R.C.P. 12(h)), especially given the court's previous recognition that the doctrine of primary jurisdiction is not "truly jurisdictional." Ruling on Mot. to Dismiss at 3 n.2 (May 11, 2010) (Toor, J.). Nevertheless, the court concludes that the City could move to dismiss when it did because a further pleading—namely, an answer to the fourth amended complaint—was permitted. Moreover, the court had previously expressly ruled that the City could raise the issue again.

In addition, the court concludes that law-of-the-case doctrine does not preclude ruling on this issue now. The court's May 11, 2010 ruling did not hold that the doctrine of primary jurisdiction could never operate in this case. Rather, at that early stage of the case, the court was

concerned about plaintiffs' access to a forum in which to be heard, and the inefficiencies of having discovery proceed only against Mr. Leopold when the issues as to all defendants were overlapping. Now, more than two years later, there has been ample opportunity for discovery against all defendants. Plaintiffs have had an opportunity to participate in this forum as well as before the PSB. The court's earlier concerns are no longer present, and the court's previous analysis of the *Gallipo* factors controls. The court has reviewed *Central Vermont Public Service Corp. v. Town of Springfield*, 135 Vt. 436 (1977), and *City of South Burlington v. Vermont Electric Power Co.*, 133 Vt. 438 (1975), and does not believe that either case requires a contrary result.

The court's May 11, 2010 ruling came before the PSB's October 8, 2010 order, available at http://psb.vermont.gov/sites/psb/files/orders/2010/7044OrderReSummaryJudgment.pdf. It is very clear from that order that the PSB is overseeing BT's efforts to cure its Condition 60 violation. See *id*. at p.33, ¶ 10 (requiring BT to file periodic reports detailing its progress in curing or resolving violations of the CPG). An order from this court requiring BT to reimburse the City might effectively be a "cure" to the Condition 60 violation, but it is apparent that the PSB is already handling the need to cure the violation.

Plaintiffs argue that application of the primary jurisdiction doctrine would prejudice them because the PSB cannot provide meaningful relief. They assert that the PSB's only options are to revoke BT's CPG or to assess penalties, neither of which restores the $17 million to the City's general fund. That may be true, but the court is unconvinced that the sort of judgment plaintiffs seek would be any more meaningful. Taking $17 million out of BT would repay the taxpayers, but it would undoubtedly also eviscerate BT, resulting in negative consequences for the City (such as a lowered credit rating) and its taxpayers. The better course is to defer to the process presently being overseen by the PSB. The court will therefore dismiss the claim against the City, without prejudice to it being re-filed after PSB Docket No. 7044 is closed.

C. Whether Plaintiffs' Claims for an Accounting and a Permanent Injunction are Moot

Plaintiffs' demands for an accounting and a permanent injunction were previously set out as separate counts in the Third Amended Complaint. They now appear in the Fourth Amended Complaint among plaintiffs' requests for relief. The City argues that these claims or requests for relief are now moot. City's Mot. for Summ. J. at 15–18 (filed Oct. 24, 2011); City's Mot. to Dismiss at 1 n.1 (filed Apr. 2, 2012). According to the City, an accounting would not provide plaintiffs with any more relief than they already have by way of the Interim Stipulated Order in this case, the responses they have received in discovery, and the materials supplied to the Public Service Department. The City also asserts that any demand for an order permanently enjoining

the City from violating Condition 60 is moot because the City has complied with Condition 60 since October 2, 2009.[6]

Plaintiffs contend that their request for an accounting is not moot because the information they received under the Interim Stipulated Order is insufficiently detailed for them to evaluate BT's true financial condition or prospects and because the City's discovery responses do not constitute an accounting. Plaintiffs also argue that, unless the City agrees to make permanent the interim order prohibiting violations of Condition 60, their request for a permanent injunction is not moot because without it, the City would be free to return to its old ways.

In reply, the City maintains that the accounting claim is moot because the City has produced tens of thousands of pages of documents in discovery, monthly reports to plaintiffs, copies of status reports to the PSB, and actual printouts from the City's accounting and financial management program. The City says that, to the extent that plaintiffs claim that they cannot understand the materials provided, plaintiffs could have followed up at any time. The City also says that plaintiffs' request for a permanent injunction is moot because the City is bound to comply with the CPG regardless of an order from this court.

The court concludes that plaintiffs' demand for a permanent injunction is moot. The City is in no way free to return to its "old ways." The public scrutiny brought upon the City, coupled with the active oversight by the Public Service Board and an electoral change, suggest as much. Moreover, a permanent injunction effectively making a PSB order an order of this court as well would be administratively confusing and redundant, and could lead to conflicting or inconsistent rulings in the event of noncompliance.

Finally, the court concludes that this is not an appropriate case for an accounting.

> Equitable jurisdiction for an accounting is usually invoked in cases where: (1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts, or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery.

---

[6] The parties did dispute whether the City had violated Condition 60 (and this court's Interim Stipulated Order prohibiting such violations) when it made payments to a financial advisor. The court ruled that the City's actions did not violate the court order, and denied plaintiffs' motion for contempt. Ruling at 7 (filed Aug. 19, 2011). The PSB reached a similar conclusion when considering the same issue. See Hr'g Officer's Report on Burlington Telecom's Mot. for Declaratory Ruling Regarding Certain Payments at 6–7, No. 7044 (Vt. Pub. Serv. Bd. Nov. 23, 2011), available at http://psb.vermont.gov/sites/psb/files/orders/2011/2011-2/7044%20OrderReConsultant Payments.pdf ("[N]o violation of Condition 60 is evident with respect to these payments.").

1 Am. Jur. 2d *Accounts and Accounting* § 54 (WL updated Aug. 2012) (footnotes omitted). Here, there has already been ample discovery, and plaintiffs have not explained with specificity what more they need.

CONCLUSION

The court construes Mr. Leopold's motion for summary judgment (filed Feb. 17, 2012) to include his recent argument on statutory nonliability pursuant to 24 V.S.A. § 903, and on that limited basis **GRANTS** the motion. Plaintiffs' motion for summary judgment against Mr. Leopold (filed Aug. 1, 2011) is therefore **DENIED**. Mr. Leopold's motion to dismiss Counts I and III (filed April 3, 2012) is **MOOT**. Mr. Leopold's (renewed) motion for summary judgment on Count II (also filed April 3, 2012) is also **MOOT**.

The City's motion for summary judgment (filed Oct. 24, 2011) is **DENIED**. The City's motion to dismiss (filed Apr. 2, 2012) is **GRANTED**, without prejudice to re-file the reimbursement portion of Count I against the City after PSB Docket No. 7044 is closed.

Dated at Burlington this ___ day of September 2012.

_____
Geoffrey Crawford,
Superior Court Judge

14